# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **AVELINO MEDEL II,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **No. 1:24-CV-00990-RP** |
| | § | |
| | § | |
| **GABRIEL WALKER PRADO, IN** | § | |
| **HIS INDIVIDUAL CAPACITY;** | § | |
| **AND CITY OF AUSTIN,** | § | |
| *Defendants* | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE ROBERT PITMAN
      UNITED STATES DISTRICT JUDGE

Before the Court are Defendant City of Austin's motion for summary judgment, Dkt. 25, Gabriel Walker Prado's first amended motion for summary judgment, Dkt. 34, Plaintiff Avelino Medel II's motion to strike, Dkt. 38, and all related briefing. After reviewing the filings and the relevant law, the undersigned recommends that the District Judge grant the motions for summary judgment and deny the motion to strike as moot.

## I.      BACKGROUND

Walker Prado responded to a disturbance at Medel's home in the early morning hours of April 6, 2024, after Medel's neighbor called police to report a possible physical disturbance. Dkts. 34-2, at 4; 34-5, at 99. Walker Prado positioned himself outside a sliding-glass door, out of sight of the occupants. Dkts. 34-2, at 5; 34-2, at 1 (2:07:54). Two other officers, Arlene Lozano and Ryan Daniel, arrived at Medel's

1

home and walked by the sliding-glass door. Dkt. 34-2, at 1 (2:07:55). Lozano testified that she did not see any physical violence, crime, or gun as she passed. Dkt. 42-2, at 14-15. Daniel testified that, upon glancing in "for maybe a second or two," he saw two men "standing close together" in "active argument." Dkt. 42-6, at 10.

From his vantage point outside the glass door, Walker Prado observed a younger man, Medel, "repeatedly yell and scream" at an older man, who was later identified as Medel's father, Avelino Medel, Sr. *Id.* Consistent with Lozano and Daniel's earlier impressions, Walker Prado told the other officers that the men were "just yelling." Dkt. 34-2, at 1 (2:08:12). A fourth officer, Adam Reinhart, arrived shortly afterward, but did not see inside the apartment. Dkts. 42-10, at 11-12; 34-2, at 1 (2:08:29); 34-2, at 2 (2:08:27). Officers Lozano, Daniel, and Reinhart positioned themselves outside and to the side of Medel's front door. Dkts. 34-2, at 1 (2:08:40); 34-2, at 2 (2:08:38); 42-2, at 16; 42-6, at 10.

Medel attests that while police were stationed outside his home, he was talking to his father about Medel's belief that his father's friends owed Medel, Sr. money. Dkt. 42-7, at 2. Medel admits that the conversation was loud but insists that he never threatened his father during their conversation. *Id.*; *see also* Dkt. 42-8, at 2. Based on his observations, Walker Prado believed that Medel was about to attack Medel, Sr., and that the officers needed to engage Medel in order to prevent him from doing so. Dkt. 34-2, at 5-6.

Reinhart positioned himself on the left side of Medel's front door and Lozano and Daniel positioned themselves on the right. Dkts. 34-2, at 1 (2:08:59); 34-2, at 2

(2:08:54). Walker Prado remained outside the sliding-glass door. Dkt. 34-2, at 1 (2:08:59). From there, Reinhart used his baton to knock loudly on Medel's door. *Id.* at 2:09:00. After he knocked, Reinhart called out, "Austin Police Department. Open the door." *Id.* at 2:09:02.

Medel stated that after hearing the knocking, he was "surprised and scared." Dkt. 42-7, at 3. According to Medel, he "did not hear anyone outside say anything after the banging" on his door. *Id.* Concerned that someone dangerous could be outside his door, Medel picked up his pistol. *Id.* at 4.[1] This was the first time Walker Prado saw the gun. Dkt. 34-2, at 6. Medel contends that he walked at a "normal" pace to his pistol, picked it up, and resumed walking at a normal pace to the door to look through the peephole. Dkt. 42-7, at 4. Medel states that as he walked, he "kept the pistol pointed up." *Id.*; *see* Dkt. 34-2, at 1 (2:09:04). In contrast, Walker Prado contends in his declaration that Medel grabbed the gun, loaded a magazine, chambered a round, and "aggressively" walked toward the door. Dkt. 34-2, at 6. He adds that Medel "muzzle swept" the door before pointing the gun up. *Id.* In his deposition, Walker Prado testified that after loading the gun, Medel held it in a "low, ready position" as he moved toward the door. Dkt. 42-1, at 10.

Next, Walker Prado yelled to the other officers, "He's got a gun! Gun, gun, gun, gun, gun!" Dkt. 34-2, at 1 (2:09:04); 34-2, at 7. At that time, he states he had "just seen" Officers Lozano, Daniel, and Reinhart standing behind the front door. Dkt. 34-

---

[1] The footage from Walker Prado's body-worn camera does not show Medel picking up the gun. Walker Prado explains that because he "positioned his body to try and stay out of sight of the subjects," his "line of sight was different from what was captured by the body worn camera positioned on [his] chest." Dkt. 34-2, at 5.

2, at 6; *see* Dkt. 34-2, at 2 (2:08:59). Before Medel reached the front door, he heard Walker Prado yelling from outside the sliding-glass door but could not make out what had been yelled. Dkt. 42-7, at 4.[2] He looked toward the sliding-glass door and saw his own reflection. *Id.* Medel attested that he did not point his gun toward either the sliding-glass door or the front door. Dkt. 42-7, at 4.

As he alerted the other officers that Medel had a gun, Walker Prado aimed at Medel. Dkts. 34-2, at 7; 34-2, at 1 (2:09:04). Medel asserts that at the time Walker Prado stepped out to aim, Medel's gun was pointing up in a "high ready" position. Dkts. 42, at 6-7; 34-2, at 1 (2:09:04). Medel then moved the gun to his chin but did not fully extend his arms; he also looked toward the sound of yelling outside his sliding-glass door. Dkt. 34-2, at 1 (2:09:05). Walker Prado did not verbally warn Medel before he started shooting. Dkts. 34-2, at 7; 42-1, at 15-16; 34-2, at 1 (2:09:04). Walker Prado fired three rounds. Dkt. 34-2, at 1 (2:09:05-06). Medel then dropped behind the couch, and according to Walker Prado, Medel still had his gun in his hand as he did so. Dkt. 34-2, at 7; 34-2, at 1 (2:09:05-06). While Walker Prado was not able to see Medel after he fell behind the couch, Medel does not dispute that he had the gun in his hand while laying behind the couch. Dkts. 34-2, at 7; 42-7, at 4; *see* Dkt. 42, at 11 (stating only that Medel did not *reach* with a gun in his hand). Walker Prado realigned his sights to aim at where he believed Medel would have landed and fired a fourth shot. Dkts. 34-2, at 7; 34-2, at 1 (2:09:08).

---

[2] While it is unclear from Medel's declaration whether the "window" he refers to is the sliding-glass door that Walker Prado was positioned behind, body-worn camera footage depicts Medel looking out of the sliding-glass door in Walker Prado's direction. *See* Dkt. 34-2, at 1 (2:09:04).

Based on these facts, Medel sued Walker Prado for excessive force in violation of the Fourth Amendment. Dkt. 1, at 24-25. Walker Prado now moves for summary judgment on qualified-immunity grounds. *See* Dkt. 34. Medel also moves to strike certain exhibits to Walker Prado's motion for summary judgment. Dkt. 38.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine

fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.    WALKER PRADO'S MOTION FOR SUMMARY JUDGMENT

Medel brought an excessive-force claim against Walker Prado, alleging that Walker Prado shot Medel four times despite Medel's having "not done anything justifying" such a use of force. Dkt. 1, at 24-25. Walker Prado moves for summary judgment on Medel's excessive-force claim, arguing that Medel cannot overcome his assertion of qualified immunity. *See* Dkt. 34.

Qualified immunity shields a public official "from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Taylor v. Riojas*, 592 U.S. 7, 8 (2020). Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021) (quoting *White v.*

6

*Pauly*, 580 U.S. 73, 79 (2017)). "When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Club Retro LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009). To meet this burden, a plaintiff must plead specific allegations demonstrating: "(1) the violation of a constitutional right that (2) was clearly established at the time of the alleged misconduct." *Linicomn v. Hill*, 902 F.3d 529, 533 (5th Cir. 2018).[3] "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). The law is clearly established if there is factually similar, controlling case law. *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015). Because Walker Prado asserts a qualified-immunity defense, Medel "must rebut the defense by establishing a genuine fact issue as to whether the [officers'] allegedly wrongful conduct violated clearly established law." *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)); *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001). When video evidence is available, the court should consider "the facts in the light depicted by the videotape." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (quotation omitted).

---

[3] The Fifth Circuit has at times described the second prong as an inquiry into whether an official's "actions were objectively unreasonable in light of clearly established law." *See, e.g.*, *Roque*, 993 F.3d at 334. As it has clarified though, "there is no standalone 'objective unreasonableness' element to the Supreme Court's two-pronged test for qualified immunity" as "[t]hat language is a vestige of older case law that predates the Supreme Court's current test." *Hicks v. LeBlanc*, 81 F.4th 497, 503 n.14 (5th Cir. 2023) (internal citations removed).

Clearly established law must be particularized to the facts of the case and should not be defined at a high level of generality. *White*, 580 U.S. at 79; *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (instructing appellate courts "not to define clearly established law at too high a level of generality"). Though a plaintiff need not identify "a case directly on point," he must nevertheless demonstrate that "existing precedent" has "placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (internal citation removed). Ultimately, "[t]he *sine qua non* of the clearly-established inquiry is 'fair warning.'" *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc); *Newman*, 703 F.3d at 763 ("[t]he central concept is that of 'fair warning'"). In "an obvious case," the *Graham* excessive-force factors themselves, laid out below, can clearly establish the right at issue without a body of relevant case law. *Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016); *see also White*, 580 U.S. at 79 ("Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." (internal citation removed)).

To succeed on his excessive-force claim, Medel must establish "'(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Craig v. Martin*, 49 F.4th 404, 409 (5th Cir. 2022) (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)). In this case, there is no dispute that Medel was injured by Walker Prado's use of force, so the only remaining question is whether the degree of force was unreasonable. *See* Dkt. 34, at 14 (arguing only that Walker Prado's use of force did

8

not violate the Constitution or clearly established law); *Lozano v. City of Austin*, No. A-09-CA-200-SS, 2010 WL 3069811, at *5 (W.D. Tex. Aug. 4, 2010). "Excessive force claims are necessarily fact intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Id.* (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam)). When deciding whether to use force, officers must determine "not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Deville*, 567 F.3d at 167 (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). The reasonableness of the officer's conduct cannot be judged with the benefit of 20/20 hindsight but rather must be assessed from the viewpoint of a reasonable officer on the scene at that very moment. *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

Courts evaluate excessive-force claims under the Fourth Amendment's "reasonableness" standard. *Graham*, 490 U.S. at 396. In *Graham*, the Supreme Court instructed courts to use the following factors to determine whether an officer used unreasonable force: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 389; *see also Amador v. Vasquez*, 961 F.3d 721, 727-28 (5th Cir. 2020).

Because the second *Graham* factor "typically predominates the analysis when deadly force has been deployed," the undersigned begins there. *See Crane v. City of Arlington*, 50 F.4th 453, 463 (5th Cir. 2022) (internal quotation marks omitted). Walker Prado asserts that the threat-of-harm factor weighs in his favor in part

9

because Medel engaged in threatening acts making it reasonable for Walker Prado to believe he posed an immediate threat. *Id.* at 14-24. Medel counters that Walker Prado's use of force was unconstitutionally excessive in part because Medel did not engage in a threatening act sufficient to warrant the use of deadly force and because Walker Prado did not warn Medel to put down his gun before shooting him, despite having time to do so. Dkt. 42, at 26-27.

There are a number of disputed facts in this case. In particular, the parties disagree regarding whether Medel heard the police announce themselves. *See* Dkts. 34-2, at 1 (2:09:02); 34, at 19; 42-7, at 4. They also disagree about the pace at which Medel approached the front door, where the officers had knocked. *See* Dkts. 34-2, at 1 (2:09:04-05); 34-2, at 6 (stating that Medel walked "aggressively" toward the door); 42-7, at 4 (asserting that Medel walked at a "normal" pace toward the door). And the parties dispute the position in which Medel held his gun, and whether he "muzzle-swept" or lowered the gun toward the door. Dkts. 34-2, at 1 (2:09:05); 34-2, at 6; 34-3, at 7; 42-7, at 3-4; 42-12.[4] Essentially, the parties disagree regarding whether Medel posed a risk of immediate harm that would justify Walker Prado's use of deadly force. *See Reyes v. Bridgwater*, 362 F. App'x 403, 408 (5th Cir. 2010) (citing *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009)) (stating that the summary judgment standard requires the court to conclude that there was no threatening act leading the officer to discharge the weapon).

---

[4] As discussed in more detail below, the video evidence shows that Medel lowered his gun to his chin as he looked toward the sliding-glass door. Dkt. 34-2, at 1 (2:09:05).

Further, the parties agree, and the footage confirms, that upon seeing Medel with a gun in his hand, Walker Prado yelled, "He's got a gun! Gun, gun, gun, gun, gun!" Dkt. 34-2, at 1 (2:09:04); 34-2, at 7. Despite this, Walker Prado contends that he "did not believe it was feasible to negotiate with [Medel] or warn him [Walker Prado] was going to use deadly force, because those options would not definitely stop the attack [he] believed was actively about to happen." Dkt. 34-2, at 6-7. Finally, the parties disagree regarding whether Medel, once he fell behind the couch, extended his arm toward the front door. Dkts. 34-2, at 7; 42-7, at 4. As explained below, none of these disputed facts is material to whether Walker Prado violated Medel's constitutional rights.[5]

### A. Walker Prado did not violate Medel's clearly established rights with respect to the first three shots.

> 1. Walker Prado did not violate Medel's constitutional rights when he fired the first three shots.

Even viewing the evidence in the light most favorable to Medel, Walker Prado did not violate the Fourth Amendment by firing the first three shots. An "officer's use of deadly force is not unreasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Argueta*, 86 F.4th at 1089. Walker Prado had reason to believe Medel posed a serious threat here. Notwithstanding the parties' disputes regarding whether Medel pointed his gun at the officers at any time, Medel committed a requisite threatening act when he

---

[5] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Crane*, 50 F.4th at 461 (internal quotation marks omitted).

lowered the gun to his chin, as the video evidence shows. *See* Dkt. 34-2, at 1 (2:09:05).[6]

Under *Manis*, to deny summary judgment, the court is required to conclude that there was no threatening act that posed a risk of serious harm leading the officer to discharge the weapon. *See Reyes v. Bridgwater*, 362 F. App'x 403, 408 (5th Cir. 2010) (citing *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009)). The undersigned cannot do so in this case.

The Fifth Circuit's opinion in *Ramirez v. Knoulton* is instructive on the kind of threatening act that *Manis* requires. *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008). In that case, officers responded to a call reporting that the suspect was suicidal and armed, and arrived to find him walking from his home to his car. *Id.* at 127. Police followed the suspect's vehicle as the suspect drove below the speed limit, activating their overhead lights. *Id.* After pausing at two stop signs and making two turns, the suspect stopped his car on the side of a road. *Id.* The officers crouched behind their cars with their weapons drawn. *Id.* After initially refusing to comply with the officers' instructions to keep his hands visible and open the car from the outside, the suspect opened the car from the inside and set his feet on the ground. *Id.* The officers saw that the suspect held something in his right hand, yelled at him to show his hands, and asked what was in his hand. *Id.* Continuing to ignore police orders, the suspect

---

[6] Contrary to Medel's assertion that Walker Prado fired before Medel brought the gun to his chin, *see* Dkt. 42, at 32, the video shows Medel lower the gun to his chin before Walker Prado fired the gun. Dkt. 34-2, at 1 (2:09:04-05); *see also* Dkt. 42-13 (showing the "[l]ast frame of Walker Prado's body-worn camera before his bullet shattered the glass of Medel's sliding door"). Nor does Walker Prado's declaration admitting he "decided to fire" before Medel moved the gun to his chin show that Walker Prado fired before Medel lowered the gun: Walker Prado states that he aimed at Medel and began firing but does not describe the position of Medel's gun at the time he decided to fire. *See* Dkt. 34-2, at 6.

stood up and closed the car door with his right hand, in which he held a gun. *Id.* The suspect then stood in profile to the officers, with his arms at his sides and his gun in his right hand opposite the officers. *Id.* The suspect put his hands on his hips, then brought them together in front of his waist. *Id.* As his hands came together, the defendant officer shot him. *Id.* The Fifth Circuit reversed the district court's denial of qualified immunity, noting that the magistrate judge improperly evaluated the officer's actions with the benefit of hindsight and concluding that the officer had probable cause to believe that the suspect posed a threat of serious physical harm. *Id.* at 129-30. Of note, the Fifth Circuit found that the officer was entitled to qualified immunity even though the suspect stood in one place and kept his gun pointed away from the officers. *See id.* And the court noted that the suspect's gesture of bringing his hands together could reasonably be interpreted as a threatening gesture. *Id.* at 131.

If there was no constitutional violation in *Ramirez*, there is no constitutional violation in this case. Medel insists that he approached his front door at a normal pace and kept his gun pointing away from the officers at all times. Yet, in *Ramirez*, the Fifth Circuit found that the officer was entitled to qualified immunity even though the suspect stood in one place and kept his gun pointed away from the officers. 542 F.3d at 129-130. Even considered in the light most favorable to Medel, Medel's pace and the angle of his gun do not establish that Walker Prado's use of force was unreasonable. Further, though *Ramirez* involved a low-speed car chase where the suspect refused to comply with certain police commands, the undersigned finds that

Walker Prado's belief that Medel posed a serious threat of harm to the officers is no less reasonable, given that police announced themselves and certain undisputed facts—including that Medel walked toward the front door with a gun in his hand—could suggest an even more imminent risk of harm. Put another way, even if Medel is correct that he did not walk aggressively toward the door, muzzle-sweep the door, or otherwise lower or point his gun toward the officers, *Ramirez* suggests that Medel engaged in a *Manis* act justifying the use of deadly force.[7]

Medel contends that the act of lowering the gun to his chin, with locked elbows, cannot constitute a *Manis* act because Medel "never lowered it to aim it." Dkt. 42, at 32. Yet the law does not require Medel to completely lower and aim his gun before Walker Prado may act to defend himself or other officers. *See Manis*, 585 F.3d at 844-45; *Argueta*, 86 F.4th at 1087, 1092; *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1127, 1135 (5th Cir. 2014); *Ontiveros*, 564 F.3d at 385; *Ramirez*, 542 F.3d at 127, 131. Again, the undersigned is mindful that the reasonableness of Walker Prado's conduct cannot be judged with the benefit of 20/20 hindsight. *Graham*, 490 U.S. at 396. It is enough that Medel shifted the gun to his chin for Walker Prado to have reasonably believed Medel posed an immediate threat.

Medel argues that Walker Prado's cases, including *Ramirez*, are distinguishable because in many of those cases, the suspect knew that he was

---

[7] In *Reyes*, an unpublished Fifth Circuit opinion, the court distinguished the facts before it from *Ramirez* on the grounds that under the nonmovant's facts, the decedent did not make a "threatening gesture." 362 F. App'x at 407. The court also noted that in its case, the decedent was armed with a knife, not a gun. *Id.* As explained, the undersigned finds that Medel made a threatening gesture in this case when he lowered the gun to his chin.

interacting with police. For example, in *Manis*, the Fifth Circuit found no constitutional violation when the plaintiff reached under the seat of his vehicle and appeared to retrieve a gun while ignoring five commands from officers to show his hands. 585 F.3d at 844-45. In *Argueta*, the plaintiff ran from officers, concealing his right hand from view in a manner that looked like he was carrying a gun, after officers had followed his car, with emergency lights on, for two blocks. *Argueta*, 86 F.4th at 1087, 1092. In *Rice*, the decedent walked toward the officers with a gun, stating that he wanted to commit suicide. 770 F.3d at 1127, 1135. In *Ontiveros*, police announced themselves upon entering and then yelled, "let me see your hands" several times before the plaintiff, while hiding behind a door, reached into a boot he was holding to his chest for what could have been a gun. 564 F.3d at 385. And finally, in *Ramirez*, the decedent held a gun in his right hand, ignored officer commands to raise his hands, and brought his hands together in front of his waist while facing away from the officers. 542 F.3d at 127, 131.

This argument is unavailing. Even accepting Medel's testimony that he did not know police were at his door as true, the Fifth Circuit has stated that an "officer's use of deadly force is not unreasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Argueta*, 86 F.4th at 1089 (emphasis added). Whether or not Medel heard Reinhart announce police presence, the footage shows that they did announce themselves, and that Walker Prado reasonably believed that Medel heard the warning. Dkt. 34-2, at 1 (2:09:02). The undersigned cannot conclude that Walker Prado's belief that Medel posed a

15

threat of serious harm was unreasonable based on the fact that Medel did not know police were at his door. *See Ramirez*, 542 F.3d at 131 n.5 (stating that the suspect's "subjective intent is irrelevant where the only issue is what a reasonable officer would have believed under the circumstances"). Further, the Fifth Circuit has found no constitutional violation in at least one case in which the plaintiff did not know he was interacting with police at the time he engaged in a threatening act. In *Cass v. City of Abilene*, the plaintiff saw only the officer's gun coming through a doorway and began to raise his own gun in response. 814 F.3d 721, 726, 731-32 (5th Cir. 2016). Nothing the plaintiff could see indicated that the officer was police, as he was not wearing a police vest and his badge was opposite the plaintiff. *Id.* at 726. As the officer stepped further into the doorway, he saw that the plaintiff was raising his gun and shot him. *Id.*

Application of the remaining *Graham* factors does not counsel in favor of a different result. Even accepting Medel's argument that the officers responded to a report of a misdemeanor offense and that Medel was not attempting to resist or flee, *see* Dkt. 42, at 33-35, it remains that Walker Prado was reasonable in believing that Medel posed an immediate threat to the other officers' safety. *See Graham*, 490 U.S. at 389 (setting out the factors). Once again, the Fifth Circuit has made clear that an officer's use of deadly force is not unreasonable when that officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others. *Argueta*, 86 F.4th at 1089. Walker Prado's belief was reasonable here.

16

Because Medel engaged in a threatening gesture that reasonably showed he posed an immediate threat to the safety of the officers, Walker Prado did not violate the Constitution when he fired the first three shots.

        2.      Medel cannot show clearly established law barred Walker Prado's first three shots.

At the very least, there is no "body of relevant case law" in which an officer acting under similar circumstances as Walker Prado was held to have violated the Constitution. *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020). Notably, save one case distinguished below,[8] the parties cite no case denying qualified immunity where it is undisputed that the suspect was walking toward officers with a loaded gun in his hands. *But see Graves v. Zachary*, 277 F. App'x 344, 348 (5th Cir. 2008) ("Merely having a gun in one's hand does not mean *per se* that one is dangerous.").[9] None of the aforementioned cases clearly establishes that it is constitutionally impermissible for an officer to use deadly force against a suspect who lowered a loaded gun to his chin after walking toward a door where police officers had knocked. Indeed, many of the cases in which the Fifth Circuit has found in favor of the officer involve scenarios in which it was unclear whether the suspect had a gun in his hand at all. *See Manis*, 585 F.3d at 844-45 (suspect reached under the seat of his vehicle and appeared to retrieve a gun); *Argueta*, 86 F.4th at 1087, 1092 (suspect concealed his right hand from view in a manner that looked like he was carrying a gun); *Ontiveros*, 564 F.3d

---

[8] *Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019).

[9] In *Graves*, which is an unpublished opinion, officers first shot the suspect when he was "sitting still with his eyes closed, his hands up, and the gun to his [own] head." 277 F. App'x at 346.

at 385 (suspect reached into a boot he was holding to his chest for what could have been a gun). Further, *Poole v. City of Shreveport* is distinguishable because video evidence showed that the plaintiff's hands were visible and empty before he was shot. 13 F.4th 420, 422, 425-26 (5th Cir. 2021).

Neither do Medel's other cases clearly establish that Walker Prado violated the Constitution. Medel asserts that five binding Fifth Circuit cases "gave Walker Prado fair notice that his use of deadly force on someone who was not an imminent threat of serious bodily injury violated clearly established law, even if the person was holding a gun." Dkt. 42, at 35. Medel frames the question at too high a level of generality. *See White*, 580 U.S. at 79. To deny Walker Prado's qualified-immunity defense, the Court must find that it is "beyond debate" that deadly force may not be used against an individual who, in response to knocking on his door, picks up his gun, loads it, walks at a normal pace toward the door with his gun in "high-ready" position, and ultimately lowers the gun to his chin.

In support of his assertion that Walker Prado violated his clearly established rights, Medel cites *Griffin v. Newell*, where the plaintiff alleged that he fired two shots into the air next to a creek nearby his home—ostensibly to warn off a group of men who were chasing him—then walked home. 981 F.2d 1256, 1992 WL 386807, at *2 (5th Cir. 1992).[10] The defendant police officers confronted plaintiff in his front yard. *Id.* The officers shouted, "Stop, hands up and drop the bag." *Id.* When Griffin bent down to place the holster he was carrying on the ground, one officer shot him in the

---

[10] Under Fifth Circuit Rule 47.5.3, unpublished opinions issued before January 1, 1996, are precedent.

chest. *Id.* When Griffin asked what he had done wrong, the officer fired a second shot into Griffin's chest. *Id.* The police officers told a different version of the story: that they responded to a call about an individual who was firing a weapon, Griffin was carrying a gun as he approached his home, the officers stopped the car and informed Griffin they were police, Griffin pointed the gun in the officers' direction, one officer gave Griffin four warnings, and when Griffin did not drop the gun, the officer shot him in the chest. *Id.* The officer shot Griffin a second time when he continued to point the gun in the officers' direction. *Id.* The district court denied summary judgment based on qualified immunity, and defendants appealed, arguing that Griffin's allegations were not true. *Id.* at *3. The Fifth Circuit dismissed the appeal, explaining that the case turned on a factual dispute. *Id.*

Medel argues that his case is like *Griffin* in that he was in his own home, holding a gun, and "moving in a manner that a reasonable officer would not consider immediately threatening." Dkt. 42, at 36. Walker Prado responds that this case is different from *Griffin* because the plaintiff in that case had placed his gun back in its holster before he was shot and was shot as he bent down to place the holster on the ground. Dkt. 55, at 6. In contrast, Walker Prado argues, Medel loaded the gun and chambered a round, walked toward police with the gun, and appeared to lower the gun. *Id.* The undersigned agrees with Walker Prado that *Griffin* is distinguishable. Unlike in *Griffin*, there is no dispute that Medel's gun was unholstered and loaded with a just-chambered round at the time he was shot. Nor is there any dispute, in light of the video evidence, that Medel lowered his gun to his chin in a manner that

19

could be considered to pose a threat of immediate physical harm. *See* Dkt. 34-2, at 1 (2:09:05). *Griffin* does not place the constitutional question in this case beyond debate. *See Argueta*, 86 F.4th at 1092.

Medel also argues that *Baker v. Putnal* put Walker Prado on notice that his conduct was unconstitutional. 75 F.3d 190 (5th Cir. 1996). In that case, an officer responding to gunfire on a crowded beach found a suspect sitting inside a truck. *Id.* at 193. As the officer approached the truck, one suspect, Baker, turned in the officer's direction. *Id.* The officer shot and killed Baker. *Id.* Afterward, police recovered a pistol from under the passenger seat. *Id.* The parties disputed whether the officer had warned Baker and whether Baker was holding the pistol or pointing it at the officer. *Id.* at 198. The Fifth Circuit reversed the district court's order, finding that fact issues precluded summary judgment. *Id.*

Medel argues that this case is similar to *Baker* in that Walker Prado had the opportunity to warn Medel yet shot him without warning, notwithstanding the fact that Medel's gun was not pointed at any officer. Dkt. 42, at 39. Walker Prado asserts that *Baker* does not foreclose qualified immunity because it predated *Scott* and because Medel admitted to numerous threatening *Manis* acts that were absent in *Baker*. Dkt. 55, at 8. As with *Griffin*, the undersigned finds that *Baker* is distinguishable because uncontroverted video evidence shows that Medel engaged in a *Manis* act by lowering his gun to his chin.

Medel also argues that Walker Prado violated his rights by shooting him without warning. True, the Fifth Circuit has noted that the use of deadly force is

20

prohibited without a warning when one is "feasible," even when the suspect is armed. *Poole*, 13 F.4th at 425; *Joseph*, 981 F.3d at 337-338 (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)); *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (noting that the warning requirement is a "critical component of risk assessment and de-escalation"). But case law does not clearly establish that Walker Prado violated Medel's constitutional rights by failing to warn him in this case because the police had announced themselves and Walker Prado reasonably believed that Medel posed an imminent risk of serious physical harm to the other officers.

Importantly, the Fifth Circuit has interpreted *Garner*'s mandate that police warn suspects, when possible, before using excessive force as a "general rule" that may not apply in every case. *See Argueta*, 86 F.4th at 1093 (concluding that notwithstanding the rule from *Garner*, the parties had not presented "clearly established law holding that a furtive gesture signaling an immediate threat to officers followed by deadly force without warning constitutes a violation of the suspect's federal rights"); *see also White*, 580 U.S. at 80 ("*Garner* … do[es] not by [itself] create clearly established law outside 'an obvious case.'"). With that in mind, the undersigned considers Medel's cases.

First, in *Cole*, the suspect was a teenager walking around his neighborhood and through the woods near his home while holding a gun to his own head. 935 F.3d at 448. The defendant officers were searching for him. *Id.* One officer heard rustling in the woods near him and signaled to the other two officers that the suspect was there. *Id.* The suspect backed out of the woods with the gun to his head. *Id.* at 448-

21

49. He was unaware of the officers' presence. *Id.* He never pointed the gun at the officers or made any threatening or provocative gestures toward them. *Id.* at 449. Despite having the time and opportunity to warn the suspect to disarm himself, the officers shot him multiple times. *Id.* When the first shot hit him, he was not facing the officers or the woods but rather was oriented away from the officers at a 90-degree angle. *Id.* The suspect's body turned or fell toward one officer, and that officer shot the suspect a second time. *Id.* As a reflex from the officers' gunshots, the suspect involuntarily shot himself in the temple. *Id.* The Fifth Circuit affirmed that genuine issues of material fact precluded summary judgment, noting that viewed in the light most favorable to the suspect, the case was "obvious" with respect to the fact that the force was excessive. *Id.* at 453.

Medel asserts that his case is like *Cole* because he was not pointing his gun at the officers and did not know the officers were present when Walker Prado shot him. Dkt. 42, at 37. Medel also notes it is well-established that an officer's use of deadly force is excessive and in violation of clearly established law where an officer has time and opportunity to give a warning before resorting to deadly force but the officer forgoes that warning and shoots first. *Id.* at 38. Walker Prado disagrees, pointing out the Fifth Circuit's reading of *Cole* as clearly establishing only that it is unconstitutional to "shoot a suicidal teenager who was armed but made no threatening or provocative gestures, posed no immediate threat of harm to [the officers], [and] was facing away from the officers[.]" Dkt. 55, at 6 (citing *Batyukova v. Doege*, 994 F.3d 717, 729 (5th Cir. 2021)).

*Cole* does not place the constitutional question in this case beyond debate. Most obviously, this case does not involve a suicidal teenager backing out of the woods with a gun pointed at his own head, but rather an adult walking toward his front door with a gun pointed away from his head. Additionally, as explained above, the undersigned finds that the evidence shows that Medel lowered his gun to his chin, engaging in a threatening *Manis* act. In *Cole*, there were genuine issues of material fact regarding whether the suspect made any threatening gesture toward the officers. 935 F.3d at 449. Regarding Walker Prado's failure to warn Medel, *Cole* is further distinguishable because in *Cole*, the officers had no reason to believe that the suspect knew of their presence. 935 F.3d at 448. Indeed, the Fifth Circuit has distinguished both *Cole* and *Baker* on the grounds that the suspects were "undoubtedly unaware" of the officers' presence in those cases. *See Batyukova*, 994 F.3d at 729. It was undisputed in *Cole* that the officers did not announce themselves, and viewing the evidence in the light most favorable to the suspect, he was unaware of the officers' presence. *Id.* at 448-49. *Cole* does not clearly establish that an officer must warn a suspect before shooting when the police already announced their presence. [11]

---

[11] *Bakutis v. Dean* does not help Medel because it was decided in 2025 and the events leading to this case occurred in 2024. Even if it did predate this case, *Bakutis* does not clearly establish that Walker Prado violated Medel's rights because unlike in *Bakutis*, Walker Prado had reason to believe Medel posed an imminent threat to the officers, Dkt. 34-2, at 6, and it is undisputed that Medel approached the front door with a gun in his hand, Dkt. 34-2, at 1 (2:09:04). Further, each of the pre-2025 cases the Fifth Circuit relied on in reaching its conclusion that the officer violated the decedent's constitutional rights in *Bakutis* involved scenarios in which it was at least unclear whether the officer or officers announced themselves. *See Bakutis*, 129 F.4th at 306-07 (citing *Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *3 (5th Cir. June 10, 2024) (noting that the officer failed to identify himself as police)); *Cole*, 935 F.3d at 448 (noting it was disputed whether the officers warned the suspect); *Baker*, 75 F.3d at 198 (stating the parties disputed whether the officer ordered the suspect to freeze or drop the pistol).

Because Walker Prado had reason to believe that Medel posed a threat of serious harm to the officers at the scene, *see Argueta*, 86 F.4th at 1089, and alternatively, because Medel fails to carry his burden to show that Walker Prado violated his clearly established rights, the undersigned will recommend that the District Judge grant Walker Prado's motion for summary judgment as to the first three shots.

### B. Walker Prado did not violate Medel's clearly established rights with respect to the fourth shot.

Having determined that Walker Prado did not violate Medel's clearly established rights with respect to the first three shots, the undersigned turns to the fourth shot, which poses a slightly different question. Nonetheless, the undersigned again reaches the conclusion that Walker Prado is entitled to qualified immunity.

Medel argues that because he did not move or raise his gun from the ground after collapsing behind the couch, Walker Prado's fourth shot was an unconstitutional use of force and violated clearly established law. Dkt. 42, at 27. Walker Prado responds by pointing out that it is undisputed that Medel was still holding his gun when he dropped behind the couch, so Walker Prado reasonably believed Medel still posed a serious threat. Dkt. 55, at 3.

### 1. Walker Prado did not violate the constitution when he fired the fourth shot.

"It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). Even viewed in

24

the light most favorable to Medel, the facts of this case indicate that Walker Prado had reason to believe the threat to his fellow officers had not ended.

It is undisputed that Medel fell behind the couch with his gun still in his hand. *See* Dkts. 34-2, at 7; 42-7, at 4; *see* Dkt. 42, at 11 (stating only that Medel did not *reach* with a gun in his hand). Of course, merely having a gun in one's hand does not make one dangerous *per se. See Graves* 277 F. App'x at 348. But binding case law demonstrates that an officer does not violate the Fourth Amendment where the safety threat has not ended, as here.

In *Plumhoff*, the Supreme Court held that officers did not violate the Constitution after firing a total of 15 shots into a car when the suspect, who had engaged in a high-speed chase with police, still had his foot on the accelerator of his trapped vehicle during the 10-second volley. 572 U.S. at 776-77. The court noted that "this would be a different case if [the officers] had initiated a second round of shots after an initial round had *clearly incapacitated* [the suspect] and had ended any threat of continued flight." *Id.* at 777 (emphasis added). Fifth Circuit precedent also demonstrates that a suspect must be clearly incapacitated in order for an officer's actions to be unreasonable. True, the Fifth Circuit has held that "use of deadly force against a person who the officer knows is not dangerous is a constitutional violation." *Allen v. Hays*, 65 F.4th 736, 745 (5th Cir. 2023). But that is not the situation in this case.

Medel offers two cases he contends show that Walker Prado violated his constitutional rights by firing the fourth shot. Neither helps him. First, in *Roque v.*

25

*Harvel*, officers responded to an attempted suicide. 993 F.3d at 330. When they arrived, the decedent was pacing the sidewalk with a gun in his waistband, repeatedly saying, "Shoot me." *Id.* One officer yelled at the decedent to put his hands up, and the decedent put his arms out to the side and continued walking, yelling at the officers to shoot and kill him. *Id.* The decedent then pulled out the gun, pointed it at his head, and stated that he would kill himself. *Id.* At the time, he was turned away from the officers. *Id.* One officer yelled at the decedent to put his gun down. *Id.* The decedent then turned to face the officers with the gun pointed in the air. *Id.* An officer shot the decedent, and he doubled over, dropped the gun, and stumbled toward the street, away from the officers. *Id.* The court noted in its description of the facts that the video from home surveillance cameras near the scene "shows the black gun hitting the white sidewalk in broad daylight." *Id.* About two seconds later, while the decedent was stumbling into the street, an officer filed another shot that missed. *Id.* Two seconds after that, as the decedent "continued floundering," the officer shot him again, killing him. *Id.* The officer claimed he kept shooting because he did not see the decedent drop the gun. *Id.* at 333. The Fifth Circuit affirmed the district court's order denying summary judgment as to the last shot. *Id.* at 339.

Medel asserts that his case is analogous, and that the conflict between a reasonable interpretation of the evidence conflicts with the officer's subjective understanding of the situation similarly bars summary judgment in this case, particularly with respect to the shot to Medel's back. Dkt. 42, at 39. While the parties dispute whether Medel, once he fell behind the couch, extended his arm toward the

26

front door, Medel does not dispute that he was holding the gun as he lay behind the couch. Dkts. 34-2, at 7; 42-7, at 4; *see* Dkt. 42, at 11 (stating only that Medel did not *reach* with a gun in his hand). Because the video evidence in *Roque* clearly showed that the decedent dropped the gun onto the sidewalk, *Roque* does not show that it was a constitutional violation for Walker Prado to fire the fourth shot when Medel still had the gun in his hand. This is particularly true given that Walker Prado fired all four shots within the same two-second span—the officer in *Roque* waited two seconds between each round of shots. 993 F.3d at 330. Unlike in *Roque*, where the decedent had dropped the gun and moved away from the officers for a period of around four seconds, *see id.*, it was not clear in Medel's case that Medel had been incapacitated by the first shots.

Likewise, the decedent in *Mason* never held a gun in his hand. 806 F.3d at 273-74. In that case, the officer first fired at the decedent because he reached down to either shield himself from a police canine or, in the officer's version of the facts, to retrieve a gun from his waistband. *Id.* at 273. Once the decedent lay on the ground because of the initial volley, the officer shot him because the officer believed he was still trying to reach for the gun. *Id.* at 274. No party alleged that the decedent ever actually reached the gun. *Id.* Further, the officers in *Mason* had a clear view of the decedent and could see that he was incapacitated. *See id.* Here, Walker Prado knew only that Medel had not dropped the gun and that the initial round had not clearly incapacitated him. *See* 572 U.S. at 777. And Walker Prado had reason to believe that Medel still posed a serious threat. *See Allen*, 65 F.4th at 745 (stating that use of

deadly force against a person who the officer *knows is not dangerous* is a constitutional violation); *see also Poole*, 13 F.4th at 425 ("[W]hether the suspect is armed is often the key factor in determining if a threat to the officer justifies the use of deadly force.").

> ### 2. Walker Prado did not violate Medel's clearly established rights with respect to the fourth shot.

Medel does not carry his burden to show that Walker Prado violated his clearly established rights. As described above, neither *Roque* nor *Mason* clearly establish that Walker Prado violated the Constitution when he fired his fourth shot at a still-armed Medel, and the cases certainly do not answer the question beyond debate. Namely, *Roque* involved a visibly incapacitated and clearly unarmed suspect who, for around four seconds, had been moving away from the officers. 993 F.3d at 330. Similarly, *Mason* involved a clearly unarmed suspect. 806 F.3d at 273-74.[12] Based on these cases, every reasonable official would not have understood that Walker Prado's actions violated Medel's rights. *See Mullenix*, 577 U.S. at 11. Walker Prado's motion should be granted.

Finally, because the undersigned does not rely on any evidence subject to Medel's objections in this report, the undersigned will recommend that the District

---

[12] In *Graves*, the court found that there was a genuine issue of material fact as to whether the officer violated the suspect's constitutional rights by shooting him after he was incapacitated, but while he still held a gun in his hand. 277 F. App'x at 348-49. But a single unpublished opinion—particularly one finding only a genuine fact issue—cannot demonstrate that the law was clearly established. Therefore, Medel has not identified a case in which an officer acting under similar circumstances was held to have violated the Constitution, much less a body of relevant case law. *See Joseph v. Bartlett*, 981 F.3d at 330.

Judge deny Medel's motion to strike exhibits to Walker Prado's motion for summary judgment, Dkt. 38, as moot.

## IV.    THE CITY OF AUSTIN'S MOTION FOR SUMMARY JUDGMENT

The City of Austin moves to dismiss Medel's claims against it under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). Dkt. 25. To succeed on his *Monell* claim, Medel must demonstrate there was (1) an official policy (2) promulgated by the municipal policymaker (3) that was the moving force behind the violation of a constitutional right. *Reitz v. Woods*, 85 F.4th 780, 795 (5th Cir. 2023). "[W]ithout a predicate constitutional violation, there can be no *Monell* liability." *Id.* (internal quotation marks omitted). As Walker Prado is the only City of Austin employee in this suit, Medel's claims against the City of Austin are wholly premised on Walker Prado's alleged wrongdoing. Because the undersigned finds that Walker Prado did not violate the Constitution with respect to his use of force, Medel's *Monell* claim must also fail. *See id.* at 795-96. Accordingly, the undersigned will recommend that the District Judge grant the City of Austin's motion for summary judgment.

## V.    RECOMMENDATION

In accordance with the foregoing discussion, the undersigned **RECOMMENDS** that the District Judge **GRANT** Walker Prado's motion for summary judgment, Dkt. 34.

The undersigned **FURTHER RECOMMENDS** that the District Judge **GRANT** the City of Austin's motion for summary judgment, Dkt. 25.

The undersigned **FINALLY RECOMMENDS** that the District Judge **DENY** Medel's motion to exclude Walker Prado's summary-judgment exhibits, Dkt. 38, as **MOOT**.

The referral of this case to the Magistrate Judge should now be canceled.

## VI.    WARNINGS

The parties may file objections to this report and recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Judge need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after the party is served with a copy of the report shall bar that party from *de novo* review by the District Judge of the proposed findings and recommendations in the report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED January 12, 2026.

_____
DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE